1
2
3
4
5
6
7

United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LEON STEVEN MARTINEZ,                    No. C 09-6051 MHP (pr)

      Petitioner,                    **ORDER DENYING HABEAS
PETITION**

     v.

F. JACQUEZ, warden,

      Respondent.
_____/

## INTRODUCTION

    Leon Steven Martinez filed this pro se action seeking a writ of habeas corpus under 28
U.S.C. § 2254.  The matter is now before the court for consideration of the merits of the
petition.  For the reasons discussed below, the petition will be denied.

## BACKGROUND

    Martinez was convicted in Santa Clara County Superior Court of attempted
premeditated murder, as well as related firearm and gang offenses.  The state appellate court
provided this summary of the evidence:

    **The Shooting**
    On Sunday, August 1, 2004, at approximately 1:00 p.m. Avelino
    Hernandez-Perez, who had emigrated to the United States from Mexico in
    1999, was drinking beer with his friends in the carport area in front of the
    Gilroy apartment complex in which he then lived. He was wearing a shirt with
    yellow stripes, blue jeans and belt with decorative markings and a large belt
    buckle. He was crouching in a kneeling position similar to a catcher's on the
    driver's side of a Silverado truck parked in the carport.

    Mr. Hernandez-Perez noticed a Yukon[1] drive past them on Forest Avenue. The
    car made a U-turn and pulled into the driveway of the apartment complex. The

---

[1]At trial, Mr. Hernandez-Perez variously described the vehicle as a Chevy Tahoe or a
Yukon, but he identified People's exhibit No. 11 as a picture of the Yukon from which the shots
were fired.

driver kept looking at them. The driveway was a dead-end, and the driver of the Yukon turned around and drove back the way it had come. On his way out of the driveway, the driver of the Yukon stopped approximately six feet away from him, lowered the driver's side window and said, "Hey, where are you from," in English.

The driver wore a red stocking cap pulled down to just above his eyebrows.[2] Mr. Hernandez-Perez responded in Spanish that he was "going to find someone who spoke English because [he] didn't speak English," and as he spoke the driver produced a handgun and started shooting.

As soon as Hernandez-Perez saw the gun he stood up and ran, seeking cover under the Silverado truck. But immediately upon pulling out the gun, the driver fired off three or four shots, and the first bullet struck Mr. Hernandez-Perez in the side, in the flank area. The second bullet went into the hip and came out of his upper thigh. Then the Yukon made a left turn out of the driveway onto Forest Street and drove off towards Leavesley.

The only occupant of the Yukon was the driver; there was no one else in the front seat area. Hernandez-Perez did not see anyone in the backseat, but the windows were tinted black and he could not see in.

Paramedics arrived at 1:30 p.m., about 25 minutes after the shooting. Mr. Hernandez-Perez was in the hospital for four days. When the police came to his house to see him 15 days later, he was still in pain and could not move without great discomfort. He needed a crutch to walk for a month after he was shot. At the time of the trial, he still had numbness in the area of his wounds and a throbbing pain when he lifted something heavy.

Gilroy Police Officer Joseph Deras interviewed Mr. Hernandez-Perez at the hospital.[3] He showed Mr. Hernandez-Perez a photographic lineup two different ways. The first time, he showed Mr. Hernandez-Perez just the pictures. The second time, he used an envelope to cover the top part of the head down to the eyebrows, to simulate a cap, because Mr. Hernandez-Perez described the shooter as wearing a red beanie cap. Mr. Hernandez-Perez did not identify defendant's picture either time.

**Defendant's Whereabouts on August 1, 2004**
Rebecca Benavidez knew defendant in August 2004 because he was living with her daughter, Maggie. Maggie, defendant, and defendant's brother, Adam, had helped her move back to Gilroy from Southern California. Defendant had breakfast at her apartment on Murray Avenue, across from San Ysidro Park, on the morning of August 1, 2004. After breakfast, defendant left in her daughter's Yukon to get the oil changed. She believed he was alone. Later than morning, her daughter left in her (Benavidez's) car.

Defendant returned to Benavidez's apartment around noon or 1:00 p .m., looking for her daughter. When she told him that her daughter was not there, he left again. At some point after he left, Maggie returned. About 45 minutes after

---

[2] Mr. Perez identified People's exhibit number 10, a red stocking cap, as "just like the one [he] saw on the individual's head."

[3] Officer Deras was called by the defense.

2

defendant left, she heard police sirens and went outside. She saw defendant running by, about 25 feet away from her. She looked out to Murray Avenue and saw her daughter's truck parked on the side of the road with the door open and the stereo on.

**In-court Identification**

At trial, Mr. Hernandez-Perez identified defendant as the driver of the Yukon who shot him. He could not remember what the driver was wearing on the top portion of his body because "[i]t all happened so fast." He "barely remember [ed]" that at about 7:30 p .m. that night at the hospital, the police showed him a series of six photos. He had been given some painkillers and he was "a little unconscious." However, at trial, on cross-examination, he recalled that he twice picked out the picture of the individual who shot him: the man depicted in the photograph number 2 (defendant). He made it clear to the police that photo number 2 was of the man who shot him "because [he] didn't want them to press charges against an innocent person." Mr. Hernandez-Perez testified that his recollection was better at trial than it was on the day he was shot, two and a half years earlier; his memory had not faded at all. He was 100 percent certain of all the things to which he had testified.

**Defendant's Apprehension**

At 1:06 p.m., Gilroy Police Officer Mark Tarasco received a call of a drive-by shooting on Forest Avenue. A "B.O.L." was broadcast for a tan or gold Yukon involved in the shooting. At 1:09 p.m., Officer Tarasco was traveling on I.O.O.F. Avenue just past Forest Avenue when he spotted a gold-colored G.M.C. Yukon go through a stop sign at the intersection of I.O.O.F and Murray Avenues at 30 miles an hour. The Yukon continued traveling on Murray at speeds up to 45 or 50 miles per hour. Officer Tarasco followed the Yukon with his lights and siren on. The Yukon came to an abrupt stop in front of several apartment complexes across from San Ysidro Park. Officer Tarasco's car stopped behind the Yukon, just as the driver-side door of the Yukon swung open and the driver, identified by Officer Tarasco as defendant, ran out of the car toward the apartment complexes. He was wearing a white tank top and red warm up pants.

Officer Tarasco lost sight of defendant when he jumped over a five or six foot wooden fence in the complex. Tarasco broadcast a description of defendant and his clothing over the radio to other officers in the area. No one else got out of the Yukon.

Officer Tarasco immediately looked in the Yukon. It was a two-seater. No one was hiding in it. In the cargo space behind the second seat, Officer Tarasco found a lunch pail which contained a big-barreled, .44 Magnum revolver wrapped in a red shirt. He also found a red beanie.

Gilroy Police Officer Noel Provost was one of a number of Gilroy police officers who had gathered in the area of Forest Street, I.O.O .F. Avenue and Walnut Lane in response to Officer Tarasco's broadcast. Gilroy Police Department Communications radioed them that a neighbor had seen the suspect at a house to the left of 305 Walnut Lane. The police conducted a house-to-house search of a quarter-mile area for 1 hour and 49 minutes before finding defendant at 340 I.O.O .F. Avenue. Officers were invited into the house by a teenaged boy. After identifying himself and getting no response at a locked bedroom door, Provost kicked a hole in the door and entered. A bathroom door in the bedroom was also locked. In the meantime, Officer Ryan

Hollar had climbed into the bathroom through the window, despite efforts on the part of a person inside the bathroom to prevent him from doing so. The person hiding inside identified himself to Officer Hollar as Leon Martinez. When Officer Provost again announced himself and ordered the suspect to open the door, defendant did so.

In the bedroom, buried under other clothing in a laundry basket that was covered with a cardboard box containing miscellaneous items, police found defendant's white tank top and red sweat pants.

Police immediately covered defendant's hands for later gunshot residue testing. He was wearing a short-sleeved T-shirt with a design on the front and blue sweat pants.

**Forensic Evidence**
Criminalist Steven Dowell, an expert on gunshot residue (GSR), analyzed samples that had been collected from defendant's hands, a white tank top, and a pair of red sweatpants. He found one highly specific particle of gunshot residue on the sample from defendant's right hand and two highly specific particles of gunshot residue on the white tank top. A highly specific particle only comes from the primer material of cartridges, meaning that it comes from the discharge of a firearm. The presence of one highly specific particle of gunshot residue on a person's hand requires an explanation of how it got there. Dowell could not say that "the person discharged the firearm because of the possible ways that the particle could have ... arrived on this hand, but ... he was somehow associated with an event, the discharge of a primer material ." Dowell explained that the presence of GSR on a person's hands was consistent with the person firing the gun, but it was equally possible that the GSR on a person's hand was from having the hand in the area where a gun was fired. He testified: "[I]f I interact with an environment in which there's gunshot residue, I can collect those particles or transfer those particles to my hands although I didn't discharge a firearm and I wasn't near the firearm when it went off but I came into an environment in which there was gunshot residue. Or if someone else touches me who was in that environment or in some way or another touches me they can transfer the particles. So I don't have to be directly related to the event. I can be unrelated to the event and still collect these particles."

Criminalist Eric Barloewen, a firearm expert, examined the .44 Magnum revolver recovered from the truck and a fired bullet recovered from the scene of the shooting. He determined that the revolver had fired the bullet.

Barlowoen also processed the revolver for fingerprints by various means including the use of specific wavelengths of light to try to enhance potential ridge details; superglue fuming to bond to the oils in sweat and form a white polymer; a fluorescent dye staining procedure and the traditional black fingerprint powder. He took 12 digital images of the ridge detail revealed by the different enhancement techniques. There were no ridge details on the grip of the gun.

Fingerprint examiner Michael Valverde, an expert in fingerprint comparison and analysis, analyzed photos sent to him by the Crime Lab. The photos contained "ridge detail that was unusable either because it was insufficiently clear or so fragmented that identifications could not be effected even with a named individual and ... known fingerprints." Many of the photos were of the same ridge detail "captured using different techniques, alternate light sources,

4

but the same images were being captured." He did not document how much ridge detail was not usable "for the purpose of making a fingerprint comparison." Two images of the same ridge detail on the recovered gun were compared to defendant's known prints and both images were of the defendant's left ring finger phalange. Defendant's fingerprint was found "along the right side of the frame just above the trigger and in front of the trigger."

Valverde did not find any other usable prints that he could "automate" into the "system" on the gun. He explained that if, after evaluating the print, the fingerprint analyst was not furnished with a named individual for comparison, "we would attempt to automate, is the terminology we use, encode that print whether it's a palm print or a fingerprint and try to develop a list of candidates for comparison." In this case, he did not "believe there were any [prints] that were really automatable, which would make them of a lesser quality, and a manual comparison would need to be done." On cross-examination, Valverde agreed with defense counsel that it was possible that "the other 11 pictures had fingerprints on them that were usable and belonged to somebody other than Mr. Martinez." It was also possible the other prints belonged to defendant, but without having the name of another person to which the prints should be compared, they remained "usable and unidentified and not automatable."

Criminalist Opritsa Tudoriu, an expert on DNA analysis extracted six DNA samples from the inside of the forehead area of the red cap recovered from the Yukon. Four of the six samples generated DNA profiles. By comparing the DNA on the cap to the DNA in a vial of blood drawn from defendant, Tudoriu was able to determine that defendant was the sole source of the DNA from one of the areas sampled on the cap, and he could not be excluded as being a possible contributor to the DNA mixtures from the three other areas sampled on the cap. At least three, and maybe more, people contributed DNA to the three samples containing mixed DNA.

**Gang Evidence**
Gilroy Police Officer Jeff Roccaforte testified as an expert on Hispanic criminal street gangs. According to Officer Roccaforte, there are two main groups of Hispanic criminal street gangs in California, the Norteños and the Sureños, and the geographical dividing line is in Bakersfield. Typically, Hispanics from Southern California are considered Sureños, while those from Northern California are considered Norteños. In Gilroy, there are several Hispanic gangs claiming control of different parts of the city, but the gangs are predominantly affiliated with the Norteños, although there are some Sureño gang members in the city. Norteños and Sureños are rivals, and in the city of Gilroy it is very common for Norteño gang members to attack Mexican nationals, who are considered Sureños, even if they are not gang members. In Northern California, and particularly in the Gilroy area, the line between Sureños and Mexican nationals is blurred because the Sureño gang members in the area are typically Mexican-born Hispanic males or first or second generation Hispanics from Mexico who often speak Spanish only. Norteños claim the letter N, the color red, and the number 14. Sureños claim the color blue and the number 13.

Officer Roccaforte researched police reports and certified court records of crimes involving Norteño gang members in Gilroy, in defendant's home town

of Salinas, and in Monterey County.[4] On May 19, 2001, Paul Zapata, an admitted Norteño gang member, killed Juan Trigueros, a Mexican national who was not a gang member, at the 7-Eleven store on Leavesley Avenue in Gilroy. The victim was wearing a jersey with the color blue on it. The jury convicted Zapata of first degree murder and found that he had committed the murder for the benefit of the gang. This was a very good example of a primary activity of a Norteño criminal street gang. The primary activities of Norteños in the city of Gilroy are murders, attempted murders, assaults and robberies. Several bars in Gilroy cater to Mexican nationals, and several patrons have been robbed by Norteño gang members. Roccaforte knew of several robberies where a Mexican national was strong-armed and robbed of an item of blue clothing, as a sign of power and a show of disrespect to Mexican nationals.

Roccaforte located another gang-related murder in Pacific Grove, Monterey County. In that case, a jury convicted Anthony Estrada and Leo Quintos, both self-admitted Norteño gang members, of murder and found that the murder was committed for the benefit of the Norteño criminal street gang. In a third case located by Roccaforte, David Anthony Garcia, a self-admitted Norteño gang member, was convicted of a second degree robbery that was found to have been committed for the benefit of the Norteño criminal street gang.

Based on police department records of contacts between defendant and various police agencies, Roccaforte determined that defendant was a Norteño gang member. For example, in a search of defendant's bedroom conducted by the Stanislaus County Sheriff's department in June of 2002, a shotgun was found draped with a red bandana. According to Roccaforte, a red bandana is the Norteño flag. In December of 2003, defendant, wearing a red 49er's cap, admitted to a Salinas police officer that he had been a Norteño associate for one year. In June of 2000 and in August of 2003, defendant admitted to Monterey County Jail employees that he was a Norteño gang member. In June of 2000 he was also a passenger in a car stopped by Salinas police. A loaded .357 Magnum was found in the car, which was driven by a person "validated" by the Salinas police department as a Norteño gang member. He also twice admitted being a Norteño gang member to police officers in 1998. It was noted that year that he had the number "14" tattooed on his stomach. In 1999, he was arrested wearing a red hat with the word "Salinas" on it and a belt buckle with the number "4" engraved on it; that number is a variation of the number "14" which corresponds to the letter "N", the fourteenth letter of the alphabet. Defendant still had this tattoo on his stomach when he was in county jail in November of 2004. In Roccaforte's opinion, defendant was still a Norteño gang member at the time of trial.

In addition, Officer Roccaforte testified about several "kites" that were found in defendant's cell or on his person while housed at the Santa Clara County jail. A "kite" is a letter written by an inmate in a very tiny hand that is used to deliver information between gang members. For example, one kite had 12 of "The 14 Bonds"-the Norteño constitution-written on it. Another was a roster of active gang members in custody at that time; defendant was listed. Yet another

---

[4]The jury was instructed on the nonhearsay uses of Roccaforte's testimony as follows. "Ladies and Gentlemen, throughout the course of the testimony of the detective you're going to hear matters that are outside of his direct personal knowledge that are being presented to you as the basis of his opinion, and those matters are to be considered by you not for the truth of the matter stated but merely to explain the basis for his opinion."

was a incident report addressed to "my felon Ns" (a symbol for Norteños) about a Samoan inmate's disrespect of a gang member. In it, defendant identified himself as the author by his gang moniker ("Cholio de Salas") and by his rank as the "overall" in charge of the seventh floor tier at the county jail. The number and content of the kites in defendant's possession indicated that he was a high-ranking gang member in a position of authority in the jail.

Officer Roccaforte also reviewed the evidence from the case at hand. It was significant that defendant wore a red knit cap at 1:00 p.m. on an August day in Gilroy; it indicated to him that defendant wore the cap not to keep his head warm but to advertise his gang affiliation. He also noted that many Mexican nationals lived in the area of Forest Avenue between Leavesley and Swanston (where the shooting occurred) and that it was an ideal street to drive down if one were looking for a Mexican national. In addition, the victim's longish hair and the design on his belt buckle could lead a Norteño gang member to believe that the victim was a Sureño or a Mexican national and make him the target of an attack.

The greeting, "Where are you from?" is used by gang members as a challenge. There is no right answer to that question; it means that an assault is going to occur after that phrase is spoken. In Officer Roccaforte's opinion, the attack on Mr. Hernandez-Perez was committed for the benefit of the Norteño street gang because gang members derive their power from, and thrive on, the fear their violent acts instill in the community.

**Defense Case**[5]

Defendant's estranged wife testified on his behalf. Maggie was defendant's girlfriend in August of 2004. She had subsequently married defendant but they were separated at the time of trial. When Maggie returned to her mother's apartment, she "called defendant to pick [her] up at [her] mom's." It seemed as if she talked to him seconds before she heard the police. The next time she saw defendant he was running through her mother's apartment complex and jumped a fence. He was wearing a white tank top and red sweat pants. At that point she saw the Yukon parked "some feet" away from her mother's apartment; the motor was running and the music was on.

When defendant left in the morning to get the oil changed, he did not have the green lunch bag, red beanie, or gun that were later found in the truck by police. After Maggie got her truck back from the police, she saw that it had a sticker in the window indicating that the oil had been changed on August 1.

Their relationship had always been an on and off thing, and there were times that defendant would use methamphetamines. During the year and a half prior to August 1, when defendant wasn't living with her in Gilroy, he was living with his parents in Salinas. When he lived with her, he did not invite individuals to the house who looked to her as if they were Norteño gang members and did not wear a lot of red. She had never seen him with a red knit stocking cap. She had never seen him with a gun. When they went to Los Angeles shortly before defendant's arrest, they stayed at a hotel with a lot of Sureños. Defendant did not interact with them or appear agitated in their

---

[5] As previously noted, Officer Joseph Deras testified for the defense. A summary of his testimony is included in chronological order in the statement of the prosecution's case.

presence.

A few weeks before his arrest, defendant was acting paranoid about the GPS system in the Yukon.

Professor James Hernandez, who teaches criminal justice at the California State University at Sacramento, testified as an expert in gangs. He views "Norteño" and "Sureño" as identities "that people want to hang onto" and as a "precursor to being involved in the gang." "Gangs are primarily neighborhoods." There are two key Hispanic prison gangs, the Nuestra Familia, which claims the color red and dominates in Northern California, and the Mexican Mafia, which claims the color blue and dominates in Southern California. These gangs operate in the prisons, but they also have street regiments that operate on the streets and are different from street level gangs. Street level gang members tend to be youngsters in their teens, whereas the prison gang members tend to be older, in their 30's and 40's. Membership in a street gang tends to be short term, whereas membership in a prison gang is generally for life. Street gang members join or stay in gangs to avoid getting into fights, for safety and to have a sense of belonging, as in a family. A large number of street gang members are foster children or abused children.

After reviewing all of the police reports, the preliminary hearing transcript and the testimony of Detective Roccaforte, Prof. Hernandez concluded that this case was not necessarily gang related. In his opinion, the tattoo on defendant's stomach was old and did not indicate current gang membership. The crime itself did not have the hallmarks of a gang statement. He did not consider the wearing of a red hat as such a statement.

The parties stipulated that when defendant was arrested on August 1, 2004, he had methamphetamine in his system.

**Rebuttal**
Officer Tarasco was recalled and testified that he spoke with Maggie when he waited with the Yukon after the defendant fled from the car. She told him she never heard from defendant after he left her mother's house at noon.

Resp. Ex. 2, California Court of Appeal Opinion ("Cal. Ct. App. Opinion"), at 2-13

(renumbered footnotes in original).  On July 2, 2007, Martinez was sentenced to a term of 35

years to life in state prison.

Martinez appealed.  The California Court of Appeal affirmed the judgment in an

unpublished opinion filed September 26, 2008.  The California Supreme Court denied

Martinez's petition for review on December 23, 2008.

Martinez then filed this action, seeking a writ of habeas corpus.  The petition alleged

five claims for relief: (1) the trial court's exclusion of expert testimony regarding eyewitness

identification deprived Martinez of his Sixth and Fourteenth Amendment rights to present a

defense; (2) the trial court's denial of a pretrial line-up violated Martinez's Fourteenth

8

Amendment right to due process; (3) Martinez's right to due process was violated because there was insufficient evidence to prove the gang sentence enhancement; (4) Martinez's right to due process was violated by prosecutorial misconduct; and (5) Martinez received ineffective assistance of counsel because counsel failed to object to the prosecutorial misconduct.

The court issued an order to show cause, and respondent filed an answer on July 2, 2010, conceding that all of Martinez's claims have been exhausted. Martinez filed a traverse on August 9, 2010. The claims are now ready for a decision on the merits.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged conviction occurred in Santa Clara County, California, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). Respondent does not contend that state court remedies were not exhausted for the claims in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that

was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  Id. at 409.

## DISCUSSION

A.    Exclusion of Expert Testimony on Eyewitness Identifications

1.    State Court Proceedings

At trial, the defense advanced the theory that the actual shooter was another person in the Yukon, who got out of the Yukon in the three-minute interval between the shooting and the police stop.  After the victim identified Martinez as the shooter at trial, the defense sought to call Dr. Shomer as an expert witness on the potential shortcomings of eyewitness identification.  The trial court denied the request on the grounds that, because the prosecution's case was not primarily or substantially based upon the victim's identification, Dr. Shomer's testimony's probative value was outweighed by considerations of "time and presentation."  Id. at 19.

The California Court of Appeal found that the trial court's exclusion of the testimony was an abuse of discretion.  Id. at 15.  The Court determined that the physical evidence

against Martinez, corroborating the victim's identification, was not conclusive after the defense had attacked it in cross-examination.  Id. at 25.  This caused the accuracy of the victim's identification of Martinez at trial to assume more importance.  Id.  In addition, the identification's reliability was called into question because the victim had failed to identify Martinez at a photographic lineup in the hospital within days of the shooting, and he had also testified that at the time he was "a little unconscious" from his medication.  Id.  The Court then reasoned as follows:

> It is true that Dr. Shomer's testimony may not have been necessary to educate the jurors that "the passage of time frequently effects [ sic ] one's memory." However, his testimony was likely to be extremely useful in explaining less obvious factors, such as how sedation "can impact your ability to ... retain the details about the assailant" at a later time, or how the supplanting of an actual memory by imaginary information of convincing force can affect the reliability of a later identification.

Id. (internal citation omitted).  As a result, the court concluded that the probative value of Dr. Shomer's testimony outweighed the concerns of time and delay.  Id.

The California Court of Appeal went on to determine, however, that the exclusion of the Dr. Shomer's testimony did not amount to a violation of the federal constitution, and that the exclusion of the evidence was harmless beyond a reasonable doubt.  The court set forth the following explanation:

> [T]he error did not deprive defendant of his right to present a meaningful defense and was, in any event, harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18.) Each piece of forensic evidence may have been open to interpretation, but all together the pieces fit together in a way that securely tied defendant to the shooting. In addition to the forensic evidence, there was the evidence that the Yukon belonged to his then-girlfriend; that defendant's flight path took him right past his girlfriend's mother's apartment; and that he changed his attire and tried to hide the clothing that might lead to his identification in a laundry basket. The evidence of defendant's membership in a gang that hunts Mexican nationals provided a powerful motive for the shooting. Finally, through the court's instruction on the factors affecting eyewitness identification, and defense counsel's skillful cross-examination and argument, the jury was apprised of the problems with the victim's identification and was provided with the tools to evaluate it. Under these circumstances, we are convinced beyond a reasonable doubt that the error in precluding Dr. Shomer's testimony did not affect the verdict.

Id. at 26-27.

11

2.      Analysis

The right to present a defense "includes, 'at a minimum . . . the right to put before a jury evidence that might influence the determination of guilt.'" United States v. Stever, 603 F.3d 747, 755 (9th Cir. 2010) (quoting Pennsylvania v. Ritchie, 480 U.S. 39, 56 (1987)). Thus, the erroneous exclusion of critical, corroborative defense evidence violates the right to present a defense. DePetris v. Kuykendall, 239 F.3d 1057, 1062 (9th Cir. 2001) (citing Chambers, 410 U.S. at 294, and Washington v. Texas, 388 U.S. 14, 18-19 (1967)).

Even if the exclusion of Dr. Shomer's evidence amounted to a violation of Martinez's right to present a defense, habeas relief cannot be granted on this claim because the error was harmless. The California Court of Appeal found the error of state law harmless beyond a reasonable doubt, under the standard set forth in Chapman v. Arizona, 386 U.S. 18, 24 (1967). While the Chapman standard remains applicable to criminal convictions challenged on direct appeal, the Supreme Court has adopted a less strict harmless error review in federal habeas corpus proceedings. See Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993). A habeas petitioner is not entitled to relief unless the trial error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Id. at 637 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." Id. (citation omitted).

The exclusion of Dr. Shomer's testimony did not cause "actual prejudice." The identification evidence was relatively weak and did not figure prominently in establishing Martinez's guilt. The only time the victim identified Martinez was in trial, 21 months after the shooting, when Martinez was sitting at the defense table as clearly the only person accused of the crime. The victim had been unable to identify Martinez as the shooter in two photographic lineups shortly after committing the crime. The victim testified that the shooting "happened so fast" and he was unable to recall what the shooter had been wearing, and he inaccurately insisted that he had identified Martinez in the photographic lineups. By contrast to the weak identification evidence, the considerable amount of other evidence of

Martinez's guilt was strong. His fingerprint was found on the gun near the trigger, his DNA was found on the red hat worn by the shooter, and gun shot residue was found both on his hand and on a white tank top found in the bathroom where he was hiding. Although a possible innocent explanation could be made for each of these pieces of evidence individually, when taken together, the forensic evidence amounts to persuasive evidence that Martinez was the shooter. In addition, the Yukon that the shooter drove belonged to Martinez's girlfriend, Martinez was found driving the Yukon in the vicinity within three minutes of the shooting, there was no evidence that anyone else had been seen in the Yukon with the shooter, and, while fleeing the police, Martinez changed his clothing and tried to hide it. Finally, there was evidence of Martinez's motive for the shooting, namely his membership in a gang that targets people from Mexico like the victim.

The exclusion of Dr. Shomer's testimony, even assuming it would have undermined the identification evidence, did not have a substantial and injurious effect on the verdict because the other evidence was more than sufficient to establish Martinez's guilt beyond a reasonable doubt. Therefore, even if excluding Dr. Shomer's testimony amounted to a violation of Martinez's right to present a defense, Martinez is not entitled to habeas relief because he did not suffer actual prejudice from any such error.

B.      Denial of a Pretrial Lineup

        1.      State Court Proceedings

Prior to trial, the defense moved for a lineup to see if the victim could identify Martinez as the shooter. The trial court denied the motion because at that point there had been no eyewitness identification of Martinez, and the case was based entirely on the forensic and other circumstantial evidence that he was the shooter. The trial court also noted that the 21-month delay in bringing the motion from the arrest of Martinez was a factor in denying it. The California Court of Appeal upheld the trial court's ruling. The court reasoned that eyewitness identification was not at that stage a "material issue" and there was "no reasonable likelihood of misidentification" because there had been no eyewitness identification and the case rested entirely on the strength of other circumstantial evidence of

1  Martinez's guilt.  Cal. Ct. App. Opinion at 15 (citing People v. Evans, 11 Cal.3d 617, 625
2  (1974)).

3        2.    Analysis

4        Martinez claims that the denial of the pretrial lineup violated his right to due process.
5  He has cited no authority from the United States Supreme Court, and this court is aware of
6  none, that a defendant has any due process right to a pretrial lineup.  Section 2254(d) only
7  allows habeas relief where the state courts' decision is contrary to or an unreasonable
8  application of "clearly established Federal law, as determined by the Supreme Court of the
9  United States."  28 U.S.C. § 2254(d)(1).  "Section 2254(d)(1) restricts the source of clearly
10 established law to [the Supreme] Court's jurisprudence."  Williams, 529 U.S. at 412.  Thus,
11 if there is no Supreme Court precedent that controls on the legal issue raised by a petitioner
12 in state court, federal habeas relief cannot be granted because the state court's decision
13 cannot be contrary to, or an unreasonable application of, clearly-established federal law
14 within the meaning of Section 2254(d)(1).  Carey v. Musladin, 549 U.S. 70, 77 (2006).

15       Although the Ninth Circuit has held that a defendant has a right to a pretrial lineup
16 under limited circumstances, see United States v. Robertson, 606 F.2d 853, 857 (9th Cir.
17 1979), the Supreme Court has not.  Ninth Circuit precedent, even if "well established" is not
18 sufficient, in the absence of Supreme Court authority, to be the source of habeas relief under
19 Section 2254(d)(1).  See Moses v. Payne, 555 F.3d 742, 761 (9th Cir. 2009) (holding that
20 while, under Ninth Circuit precedent, it is "well established . . . that expert testimony
21 concerning an ultimate issue is not per se improper," for purposes of habeas corpus review it
22 suffices to determine that no Supreme Court case has squarely addressed the issue and,
23 therefore, state appellate court's decision affirming the admission of such testimony is not
24 contrary to or an unreasonable application of clearly established Supreme Court precedent).
25 In the absence of Supreme Court authority that the right to due process includes a right to a
26 pretrial lineup, habeas relief cannot be granted on Martinez's claim.

27       The court notes that in any event even under the Ninth Circuit authority, there was no
28 due process violation in this case.  The Ninth Circuit has held that the denial of a pretrial

14

lineup violates due process "only if the resulting in-court identification procedures are ... unnecessarily suggestive and conducive to irreparable misidentification." United States v. Domina, 784 F.2d 1361, 1369 (9th Cir. 1986) (citations and internal quotations omitted). The Ninth Circuit has held that "where the question of guilt or innocence hangs entirely on the reliability and accuracy of the in-court identification, the identification procedure should be as lacking in inherent suggestiveness as possible." Id. (quoting United States v. Williams, 436 F.2d 1166, 1168 (9th Cir. 1970)).  No particular methods of lessening the suggestiveness of in-court identifications are required, as that is left to the discretion of the trial judge. Domina, 784 F.2d at 1369.  In Domina, the court found that the trial court's denial of an in-court lineup and allowing an ordinary in-court identification did not violate due process because there was a great deal of other evidence besides the identification linking the defendant to the crimes.  Id.  Similarly, here, as discussed above, there was a great deal of other evidence linking Martinez to the shooting, including the forensic evidence, the car the shooter was driving, the clothes he was wearing, and the gang/motive evidence.  Under such circumstances, denying Martinez's request for a lineup before trial did not violate due process under the standards established by the Ninth Circuit.

The California Court of Appeal's rejection of the pretrial lineup claim was neither "contrary to" nor "an unreasonable application of clearly established" federal law.  28 U.S.C. § 2254(d)(1).

C.    Sufficiency of Evidence to Prove Gang Enhancement

1.    Applicable State Law

Martinez's sentence was enhanced based on the jury's finding that he had attempted to murder the victim "for the benefit of, at the direction of, or in association with a criminal street gang."  Cal. Pen. Code § 186.22(b)(1).  A "criminal street gang" is defined as "a group of three or more persons" that has as "one of its primary activities the commission of one or more" enumerated criminal acts.  Id. at § 186.22(f).  The gang must also have "a common name or common identifying sign or symbol" and its members must "engage in or have engaged in a pattern of criminal gang activity."  Id.

15

1

## 2.     State Court Proceedings

The California Court of Appeal summarized the gang-enhancement evidence

presented at trial as follows:

> Here, Officer Roccaforte testified that the Norteño gang was predominant in
> Northern California and that the geographic dividing line was in Bakersfield.
> He estimated that there were a couple of hundred Norteño gang members in
> Gilroy, that they identified by the color red and the number 14, and that one of
> the primary activities of the gang was the commission of murder, attempted
> murder, robbery and assault, all of which are statutorily enumerated offenses.
> (§ 186.22, subd. (e)(1) [assault with a deadly weapon or by means of force
> likely to produce great bodily injury], (2) [robbery], (3) [unlawful homicide],
> and the attempt to commit any enumerated offense].) He discussed two
> murders and one robbery committed by admitted Norteño gang members for
> the benefit of the street gang. If believed by the jury, this is sufficient evidence
> to establish that the Norteños are a criminal street gang, and that robbery,
> murder, attempted murder, and assault are the primary activities of the Norteño
> street gang.

Cal. Ct. App. Opinion at 29.

## 3.     Analysis

Martinez argues that the three prior offenses for the gang enhancement – one robbery

and two murders – committed over the three years prior to his offense are insufficient, as a

matter of law, to establish that robbery, murder, attempted murder and assault were "primary

activities" of the Nortenos within the meaning of California Penal Code § 186.22.  The

California Court of Appeal rejected Martinez's argument and held that the prior offenses, as

well as the charged offense, were sufficient to meet the statutory criteria for establishing

robbery, murder, attempted murder and assault as a "primary" gang activities.  Cal. Ct. App.

Op. at 29, 31 (citing Cal. Pen. Code § 186.22(e); *People v. Gardeley*, 14 Cal.4th 605, 625-26

(1996); and *People v. Sengpadychith*, 26 Cal.4th 316, 323 (2001) (holding that jury may

consider charged offenses as well as past offenses in determining whether the primary

activity element is satisfied)).  This court is bound by the California Court of Appeal's

interpretation of California law, and its holding in this case that the prior and charged

offenses were sufficient to satisfy the primary activity element of Section 186.22.  See Hicks

v. Feiock, 485 U.S. 624, 629-30 n.3 (1988) (determination of state law made by an

intermediate appellate court, including one announced on direct appeal of the challenged

conviction, binds a federal court sitting in habeas corpus).  Indeed, Martinez's argument to the contrary is in essence an argument that California law should not be as it is, rather than that the evidence was insufficient.  Such a claim cannot be the basis for federal habeas relief.  See Wilson v. Corcoran, 131 S.Ct. 13, ___, (Nov. 8, 2010) (reversing grant of habeas relief for violation of state law; federal habeas relief lies only for violations of federal law); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (federal habeas unavailable for violations of state law or for alleged error in the interpretation or application of state law).  This argument is rejected for that reason.

Martinez also argues that there was insufficient evidence because Roccaforte based his opinion that Nortenos were involved in robberies, murders, attempted murders and assaults only upon police reports and court records of three prior crimes, and not on personal interviews with police officers and witnesses involved in those crimes.  A state prisoner who alleges that the evidence in support of the state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, Jackson v. Virginia, 443 U.S. 307, 321 (1979), which, if proven, entitles the petitioner to federal habeas relief, id. at 324.  The federal court determines only whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319.  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, has there been a due process violation.  Id. at 324.  And after the AEDPA, a federal habeas court applies the standards of Jackson with an additional layer of deference, asking whether the state court's application of Jackson was objectively unreasonable.  Juan H. v. Allen, 408 F.3d 1262, 1275, 1278-79 (9th Cir. 2005).

The California Court of Appeal, applying the standard in Jackson, rejected petitioner's argument based on the following reasoning:

> [D]efendant appears to argue that Officer Roccaforte's expert opinion lacked sufficient reliability and a factual foundation, as a matter of law, because it was not based on his personal interviews of witnesses and police officers. Expert testimony may be premised on material that is not admitted into evidence, or on material that is not ordinarily admissible, such as hearsay, if that material is

1   reliable and of a type that is reasonably relied upon by experts. (*People v.
2   Gardeley, supra,* 14 Cal.4th at p. 618.) Numerous cases have held that an
    expert may rely on hearsay in forming his or her opinion. (*See People v. Catlin*
3   (2001) 26 Cal.4th 81, 137; *People v. Montiel* (1993) 5 Cal.4th 877, 919; *People
    v. Duran* (2002) 97 Cal.App.4th 1448, 1463; *People v. Valdez, supra*, 58
4   Cal.App.4th at ¶. 510-511.) An expert witness whose opinion is based on
    inadmissible matter can, when testifying, describe the material that forms the
5   basis of his or her opinion. (*People v. Gardeley*, at p. 618.) "Thus, a gang
    expert may rely upon conversations with gang members, his or her personal
6   investigations of gang-related crimes, and information obtained from
    colleagues and other law enforcement agencies." (*People v. Duran*, at p. 1463,
7   italics added.) Here, Officer Roccaforte testified about his extensive experience
    with gangs as a police officer in both Northern and Southern California and as
8   a member of a gang task force that investigates gang activity in Gilroy. He
    personally researched and reviewed the police reports and certified court
9   records about which he testified. The jury was entitled to conclude from this
    testimony that Officer Roccaforte was qualified by training and experience to
10  render his opinions, and that those opinions were reliably and factually
    supported by police and court records. This expert witness testimony and the
11  documentary evidence of the predicate offenses, if believed by the jury, were
    sufficient to prove that the primary activity of the Norteño street gang was the
12  commission of the enumerated offenses in section 186.22. (*People v. Gardeley*,
    *supra*, 14 Cal.4th at p. 620.)

13  Cal. Ct. App. Op. at 29-30.

14       The state appellate court reasonably applied the <u>Jackson</u> standard.  To begin with,

15  Martinez cites no proscription on an expert relying upon police reports and court records, as

16  opposed to personal interviews, in forming his opinion, and it was certainly allowed by state

17  law.  The jury was not required to believe Roccaforte's opinion, and could have chosen not

18  to believe him if it felt that the records and reports upon which it was based were not reliable.

19  The jury could, however, reasonably decide that the police reports and court records reliably

20  conveyed to Roccaforte basic information about the prior crimes, such as when and where

21  they were committed and whether they were committed by gang members.  In any event, the

22  premise of Martinez's argument is incorrect because Roccaforte's opinion was based on

23  more than just the reports and records.  Roccaforte, in addition to being a member of a gang

24  task force investigating gang activity in the area, testified that he had witnessed numerous

25  robberies by Nortenos on Mexican nationals in the Gilroy area.  Reporter's Transcript. Vol.

26  10, at 1449.  Thus, his opinion testimony was not, as Martinez argues, based solely on his

27  review of the police and court records, but also on his personal experience investigating and

28  witnessing gang-related crimes in the area.  In light of such evidence, the state court

reasonably concluded that a jury could reasonably decide to believe Roccaforte's opinion that Nortenos were involved in prior crimes of robbery, murder, attempted murder and assault in the Gilroy area.

Martinez also argues that there was insufficient evidence that the prior offenses cited by Roccaforte were committed by Nortenos. The state appellate court noted that only two predicate offenses, one of which can be the charged offense, need be linked to the Nortenos in order to satisfy Section 186.22. Cal. Ct. App. Opinion at 31. There was sufficient evidence for the jury to reasonably find two predicate offenses, namely the charged offense and the Gilroy murder, were committed by Nortenos. Martinez does not dispute that there was sufficient evidence that he was a Norteno, and certified court records showed that the jury found the defendant, Paul Zapata, had committed the murder in Gilroy for the benefit of the Nortenos. Id. at 32.

There was also evidence for the jury to reasonably infer that additional predicate offenses had been committed by Nortenos. There was testimony that the Pacific Grove murderers and the robber Anthony Garcia admitted that they were gang members, and that law enforcement agencies had "validated" them as such. Id. at 31-32. Court records also showed that gang enhancement allegations were found true for two of the Pacific Grove murderers. Id. at 31. Such evidence was sufficient for a reasonable jury to find that at least two, if not more, predicate offenses had been committed by Nortenos.

The California Court of Appeal's rejection of the sufficiency of evidence claim was neither "contrary to" nor "an unreasonable application of clearly established" federal law. 28 U.S.C. § 2254(d)(1).

D.   Prosecutorial Misconduct

     1.   State Court Proceedings

Martinez claims that the prosecutor committed misconduct, in violation of his right to due process, on two occasions during closing argument. First he argues that the following remarks improperly asserted "propensity evidence" to try to convince the jury that the attempted murder was premeditated:

1      The judge read you the length of time the person spends considering whether
2      the attempted murder is deliberate and premeditated. The amount of time
       required for deliberation and premeditation may vary from person to person
3      and according to the circumstances. Let me stop there. If you're a gang member
       you're already premeditating crimes for weeks and months and years.

4   Attachment to Petition at 4.  Second, he argues that the following remarks improperly

5   disparaged defense counsel:

6      [A]s [defense counsel] was giving his closing arguments I kept thinking about
       the first thing they teach you in law school. The first thing they teach you in
7      law school is when the facts are against you, you argue the law; and when the
       law is against you[,] you argue the facts; and when the facts and the law are
8      against you [,] you point a finger at the D.A. and you get personal and you get
       dirty and you make a personal attack on the D.A. and the police officer. Now I
9      lost track. I was counting how many times he pointed at me and said
       disparaging things. I lost track at 27 I think.... I'm not going to respond each
10     and every time he misstated the law or misstated the facts.

11  Id.

12      Because defense counsel did not object to these remarks at trial,[6] the California Court

13  of Appeal found that claims were forfeited under California's rule requiring a

14  contemporaneous objection to a prosecutor's remarks in order to claim on appeal that such

15  remarks amounted to prosecutorial misconduct.  Cal. Ct. App. Opinion at 33-34 (citing

16  People v. Boyette, 29 Cal. 4th 381, 432 (2002)).

17      2.      Analysis

18      Because the state appellate court found the claim forfeited under California's

19  contemporaneous objection rule, the claim is procedurally defaulted from federal habeas

20  review.  Under the doctrine of procedural default, a federal court will not review a claim if

21  the state courts' rejection of the claim rests on a state law ground that is independent of the

22  federal question and adequate to support the judgment.  Coleman v. Thompson, 501 U.S.

23  722, 729-30 (1991).  The Ninth Circuit has repeatedly recognized and applied the California

24  contemporaneous objection rule in affirming denial of a federal petition on grounds of

25  procedural default where there was a complete failure to object at trial.  See Inthavong v.

26  Lamarque, 420 F.3d 1055, 1058 (9th Cir. 2005); Paulino v. Castro, 371 F.3d 1083, 1092-93

27

28
    ────────────────────
       [6]Martinez's claim that counsel was ineffective in failing to object is addressed below.

20

1    (9th Cir. 2004); <u>Vansickel v. White</u>, 166 F.3d 953, 957-58 (9th Cir. 1999).  Because

2    Martinez did not object to the asserted prosecutorial misconduct at trial, and the state

3    appellate court held that the claim was thereby forfeited under California's independent and

4    adequate contemporaneous objection rule, the claim of prosecutorial misconduct must be

5    rejected on the grounds of procedural default.

6    E.      Ineffective Assistance of Trial Counsel

7            Martinez claims that he received ineffective assistance of trial counsel, in violation of

8    his Sixth Amendment right to counsel, because trial counsel failed to object to the two parts

9    of the prosecutor's closing argument described above.

10           1.      State Court Proceedings

11           The California Court of Appeal, citing the correct federal standard for ineffective

12   assistance of counsel claims set forth in <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1991),

13   rejected Martinez's claim based on the following reasoning:

> We also find no ineffective assistance of counsel. As to the first comment, we see no reasonable likelihood that the jury would have interpreted the comment about premeditation as an evidentiary shortcut by way of propensity evidence. The comment referenced the correct statement of law, as expressed in the jury instruction on premeditation. It also referenced an inference that could be drawn from the evidence presented at trial that defendant was a gang member, and that one of the primary activities of the gang was hunting down Mexican nationals. Thus, counsel cannot be required to object to the comment, or blamed for failing to do so. Finally, we see no reasonable probability that a more favorable determination would have resulted in the absence of the comment.
>
> As to the second comment, we see no "reasonable likelihood that the jury would understand the prosecutor's statements as an assertion that defense counsel sought to deceive the jury." ( *People v. Cummings* (1993) 4 Cal.4th 1233, 1302.) Even if there were a likelihood that the jury understood the prosecutor's comments in the most damaging sense, we note that arguably more egregious comments have not been found to have crossed the line into misconduct. (*See e.g., People v. Williams* (1996) 46 Cal.App.4th 1767, 1781-1782 [defense counsel had to " 'obscure the truth' "]; *People v. Bell* (1989) 49 Cal.3d 502, 538 [defense counsel's job is to " 'throw sand in your eyes' " and "get his man off"]; *see also People v. Gionis* (1995) 9 Cal.4th 1196, 1216; *People v. Breaux* (1991) 1 Cal.4th 281, 305.)
>
> In any event, we need not decide whether the prosecutor's remarks constituted misconduct to which defense counsel should have objected because we are convinced the comments could not have affected the outcome of the trial either viewed singly or in combination with the prosecutor's comments about premeditation. ( *People v. Price, supra*, 1 Cal.4th at p. 440.)

1
2
3
4

> Finally, we are not convinced that there is no explanation for counsel's failure to object. In our view, this is exactly the sort of situation in which competent counsel might make a tactical decision to refrain from objecting, if in his or her estimation the client had more to lose than to gain by challenging the prosecutor's incivility. For these reasons, we reject defendant's ineffective assistance of counsel claim.

Cal. Ct. App. Opinion at 34-35.

5
6

    2.    <u>Analysis</u>

7
8
9
10
11
12
13
14
15
16
17
18

    The Sixth Amendment to the U.S. Constitution guarantees not only assistance, but effective assistance, of counsel.  <u>See</u> <u>Strickland</u>, 466 U.S. at 686.  To prevail on an ineffective assistance of counsel claim, a habeas petitioner must show that (1) counsel's performance was "deficient," i.e., his "representation fell below an objective standard of reasonableness" under prevailing professional norms, <u>id.</u> at 687-88, and (2) prejudice flowed from counsel's performance, i.e., that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different.  <u>See</u> <u>id.</u> at 691-94.  The relevant inquiry under the first prong <u>Strickland</u> is not what defense counsel could have done, but rather whether his choices were reasonable.  <u>See</u> <u>Babbitt v. Calderon</u>, 151 F.3d 1170, 1173 (9th Cir. 1998).  A lawyer need not file a motion or make an objection that is meritless on the facts and the law.  <u>See</u> <u>Wilson v. Henry</u>, 185 F.3d 986, 990 (9th Cir. 1999); <u>Rupe v. Wood</u>, 93 F.3d 1434, 1445 (9th Cir. 1996).

19
20
21
22
23
24
25
26

    The prosecutor's argument that premeditation could be inferred from Martinez's gang membership was proper, not because membership in gangs in and of itself equates with criminal activity or premeditated criminal activity, but because there was evidence in this case that a primary activity of Martinez's particular gang was targeting and killing people from Mexico.  As the victim in this case was from Mexico, Martinez's premeditation in shooting him could reasonably be inferred from Martinez's membership in such a gang.  Consequently, any objection to the prosecutor's argument to that effect would have been meritless, and counsel reasonably refrained from making such an objection.

27
28

    Even if the prosecutor's remarks about defense counsel amounted to misconduct, there was no reasonable probability that defense counsel's failure to object to them made a

difference in the outcome of the trial.  There was a great deal of strong evidence against Martinez.  His fingerprint was found near the trigger of the gun used to shoot the victim, residue from the gun was found on Martinez's hand and on a shirt found where he had been hiding, and his DNA was found on the hat that matched the shooter's.  The police found Martinez driving the car used by the shooter very near and within minutes of the shooting.  The shooter's gun and identifying hat were found in the car.  Martinez fled the police and even changed his clothing during the flight.  There was also evidence that he belonged to a gang that targeted and killed people from Mexico, like the victim.  In the context this evidence against Martinez, a single instance of improper remarks about defense counsel, remarks that did not address the strength of evidence presented or the elements of the charged offenses, was unlikely to have made any difference on the jury's verdict.  Consequently, even if counsel should have objected to the remarks, the state court reasonably concluded that Martinez was not prejudiced under <u>Strickland</u> by the failure to do so.[7]

The California Court of Appeal's rejection of the claim of ineffective assistance of counsel was neither "contrary to" nor "an unreasonable application of clearly established" federal law.  28 U.S.C. § 2254(d)(1).

D.   <u>Appealability</u>

A certificate of appealability will not issue.  <u>See</u> 28 U.S.C. § 2253(c).  This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  <u>See</u> <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000) (standard).

//

//

---

[7]For the same reasons, Martinez was also not prejudiced by the lack of an objection to the prosecutor's argument about premeditation.

1

**CONCLUSION**

2         The petition for writ of habeas corpus is DENIED on the merits.  The clerk shall close

3    the file.

4         IT IS SO ORDERED.

5    DATED: January 12, 2011

6                                               Marilyn Hall Patel
                                               United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

24